UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MICHAEL CORBO | : | CIVIL ACTION NO.: _____ |
| | : | JURY DEMAND |
| | : | |
| VS. | : | |
| | : | |
| ALERE, INC. | : | : |
| ALERE HOME MONITORING, INC. | : | |
| ALERE SAN DIEGO, INC | : | May 5, 2017 |

## COMPLAINT

**NATURE OF THE ACTION - CUTPA**

1.     This Compliant alleges violations of the Connecticut Unfair Trade Practices Act., Conn. Gen. Stat. Sec. 42-110b and 42-110g which revolves around the intentional deception by the defendants with respect to a product known as "INRatio2 PT/INR Test Strips" (collectively, the "INRatio Products").  Plaintiffs' claims concern the unlawful, immoral, unscrupulous, deceptive and misleading practices conducted by Defendants related to their intentional effort to deceive the public and the federal government regarding the known dangers of their product.  Defendants' unfair trade practices resulted in various ascertainable losses resulting directly from the intentionally deceptive behavior of the defendant.[1]

---

[1] Plaintiff also sustained various losses and damages arising from the defectiveness of the product. However, these defective-based losses and damages are the subject of a separate lawsuit, and are not part of this Complaint.  Rather this complaint focuses on the intentional deception by the defendants, and the losses arising directly from this deception.

2.  Defendant Alere, Inc ("Alere") is incorporated under the laws of Delaware, and has its principal offices located at 51 Sawyer Road, Suite 200, Waltham, Massachusetts. Alere manufactures medical devices to patients, including a medical device called the *Alere* INRatio2 Prothrombin/INR, which is designed to allow patients to self-monitor their anticoagulant levels..

3.  Alere, Inc., independently and through its subsidiaries Defendant Alere Home Monitoring, Inc. and Defendant Alere San Diego, Inc., manufactures, markets and sells medical diagnostic testing products (including the INRatio Products) for professionals, patients and consumers around the country, including in Connecticut.

4.  Defendant Alere Home Monitoring, Inc. (hereinafter, "AHM") is Delaware corporation authorized to do business in the State of Connecticut and nationwide. It is, and was at all relevant times a wholly owned and controlled subsidiary of Defendant Alere, Inc. AHM assists patients, in Connecticut and nationwide, in acquiring the INRatio Products, and provides physicians with the necessary tools to allow them to integrate the patient self-testing undertaken with the INRatio Products into their practice.

5.  Defendant Alere San Diego, Inc. (hereinafter, "ASD") is a Delaware corporation authorized to do business in the State of Connecticut and nationwide. It is a wholly owned and controlled subsidiary of Defendant Alere, Inc., with its principal place of business in San Diego, California. ASD manufactures, sells and distributes a medical device called the *Alere* INRatio2 Prothrombin/INR.

6.      Alere Home Monitoring, Inc. (hereinafter, "AHM") is a Delaware corporation authorized to do business in the State of Connecticut and nationwide. It is, and was at all relevant times a wholly owned and controlled subsidiary of Defendant Alere, Inc. AHM assists patients, in Connecticut and nationwide, in acquiring the INRatio Products, and provides physicians with the necessary tools to allow them to integrate the patient self-testing undertaken with the INRatio Products into their practices.

**JURISDICTION**

7.      Plaintiff brings his complaint under federal diversity jurisdiction, 28 U.S.C. 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

**THE FACTS**

8.      The INRatio Products were originally manufactured by HemoSense, Inc. (homeliness), a Delaware corporation based in San Jose, California. HemoSense received *Class II*, FDA approval for the INRatio PT/INR Monitors and INRatio PT/INR Test Strips in 2002 and commercial sales began in 2003. In August of 2007, HemoSense was purchased by Alere, Inc. (then known as Inverness Medical Innovations, Inc.). In 2008, HemoSense transferred its operations to Alere, Inc.'s facility in San Diego, California. In 2013, HemoSense's operations were merged into the Alere San Diego corporate entity.

9.      The International Normalized Ratio ("INR") is a standardized metric used to determine the relative speed at which blood clots in a patient's body.

10.     A patient's INR is calculated by comparing a patient's prothrombin time (the speed at which the patient's blood clots) against the normal mean prothrombin time (the average speed for blood-clotting in the general population).  The resulting contrast between a patient's prothrombin time and the normal mean prothrombin time is the patient's INR.

11.     The INR is a measurement for doctors and patients to monitor the blood clotting speed for patients who have been prescribed anticoagulants ("blood thinners") for certain medical conditions, including but not limited to blood clots, or following the surgical implantation of medical devices, including but not limited to heart valves.  Doctors can use the INR measurement to determine whether a patient should increase or decrease his/her dosage of blood thinners.

12.     It is critical for doctors and patients to be able to regularly measure a patient's INR and alter the blood-thinner dosage accordingly due to the serious health risks associated with both high and low blood-clotting times.

13.     High INRs (indicating a relatively slow blood-clotting time) can lead to excessive bleeding, and generally indicates too high a dosage of blood-thinners, and can lead to serious injury and death.

14.     In the late 1990s, Defendant, through its predecessor, developed and manufactured the "INRatio monitor," a point-of-care INR monitor that was designed to help patients who have been prescribed blood-thinners, in particular warfarin, to monitor their INRs at home.

15. The INRatio monitor worked by having patients insert a blood sample (via an INRatio test strip) into an electronic testing device. The testing device, after analyzing the blood sample, would then reveal the INR via an electronic display.

16. "In October of 2002, the FDA approved the INRatio testing kit for home use and commercial sales began in 2003. Eventually, the INRatio testing kit gave way to the "INRatio2" testing kit. Like it predecessor, the INRatio2 testing kit paired an electronic monitor with corresponding test strips.

17. Shortly after entering the marketplace, Defendants became aware that end users were experiencing "discrepant" INR results as compared with lab testing. However, between 2002 up and until January, 2007, most or all of these discrepancies were not reported to the FDA, as required by Federal law.

18. In May of 2005, following the receipt of numerous complaints concerning Defendants' INRatio systems, the FDA conducted an inspection of Defendants' (then) San Jose operations facility. Following the inspection, the FDA sent a warning letter ("2005 warning letter," to Defendants, admonishing them for their failure to file adverse event reports.

19. The letter stated, "our record indicates your firm had information indicating that INRatio devices were generating clinically significant erroneous values." The letter pointed out that, "[i]f the INR is too low, a patient will be prone to blood clots or strokes. If the INR is too high, a patient will be prone to excessive bleeding. Therefore, both high

and low test results have the potential to cause or *contribute to a death or serious injury* because they may result in erroneous dosing and thus improper control of [clotting].

20.     The letter went on to cite specific complaints that had been received by Defendants, wherein the INRatio "provided discrepant results [compared] to lab results" and "[t]his indicates that your device failed to meet its performance specifications or otherwise perform as intended, and therefore malfunctioned." Further, "[a]ll of these 15 erroneous readings were clinically significant and were thus likely to lead to incorrect application of [blood-thinner] therapy, with the likely health consequences already noted." The letter concluded that the Defendants had failed to comply with the Medical Device Reporting regulations because they did not file MDR reports within 30 days of receiving the above-mentioned complaints."

21.     The letter further concluded that Defendants' internal MDR procedure was inconsistent with all the terms of 21 CFR § 803. In particular, Defendants' internal MDR policy only treated complaints as reportable if an investigation determined that "the device *has* caused or contributed to a death or serious injury." Meanwhile, 21 CFR § 803.50 requires manufacturers to submit MDRs when a device "*may have* caused or contributed to a death."

22.     On November 29, 2006, the FDA sent Defendants another warning letter wherein Defendants were faulted for numerous failures to comply with statutory regulations. The 2006 warning letter admonished Defendants, *inter alia*, for: 1) failure to investigate complaints involving possible failures of devices to meet any of its specifications; failure to

6

promptly review, evaluate and investigate complaints representing events that are MDR reportable; and 3) failure to file MDRs with the FDA.

23.     In January, 2007, only after receiving the two letters of admonishment from the FDA, the Defendants began reporting these"discrepant results to the FDA.

24.     Now that Hemosense was forced to produce this highly inculpatory evidence to the FDA, the floodgates opened, and thousands of "adverse event reports" were subsequently filed by Hemosense with the FDA

25.     In 2007 alone, Hemosense submitted 454 "adverse event reports" to the FDA regarding the INRatio and/or the INRation2.  The vast majority of these 454 adverse event reports pertained in one way or another to allegations by end users of "discrepant results".

26.     For example, Adverse Report Number 2954730-2007-00003 filed by HeomSense describes an individual reporting that his home device displayed an INR of 1.9, while a lab test revealed an INR of 7.8.

27.     In short, in 2007 alone, HemoSense was aware of at least 400 incidents wherein a user of the INRatio alleged discrepant results.

28.     In 2008, HemoSense submitted 582 "Adverse Event Reports" to the FDA concerning the INRatio products.  Again, here the vast majority of these "adverse event reports" pertained to discrepant results being reported.  In short, in 2008, Hemosense was aware of at least 500 incidents wherein a user of the INRation alleged discrepant results.

29.     This troubling trend of discrepant results continued until the product was recalled entirely from the market.  Between 2002 and 2016, Defendants received thousands of reports concerning alleged discrepant results with the INRatio Products.

30.     At least three of these reports of discrepant results allegedly resulted in deaths.  That is, 3 decedents, through their estates have claimed that their deaths were caused by a malfunction in the device, specifically a failure of the monitor to report accurate INR levels.

31.     In 2007, a team of doctors in London conducted a study that various INR testing devices, the INRatio Products among them, for quality and reliability (the "London study).  The doctors took blood samples from patients and determined the patients' INRs using five point-of-care INR testing devices.  The doctors took those same blood samples and sent them to an outside laboratory to obtain secondary INR results.  The study determined that among the five point-of-care devices tested, the INRatio Products performed the worst, with results that deviated most significantly from the results obtained through the outside laboratory.  *See, Moore GW, Henley A, Cotton SS, Tugnait S, Rangarajan S. Clinically significant differences between point-of-care analysers and a standard analyzer for monitoring the International Normalized Ratio in oral anticoagulant therapy: a multi-instrument evaluation in a hospital outpatient setting.  Blood Coagul Fibrinolysis 2007, 18(3):287-92*.  Although Defendants dispute the methodology of this report, they at a minimum, were aware of the report and its findings no later than 2008.

32. From 2008 and through 2015, Defendants made promotional claims that their INRatio testing kit was "accurate," "convenient," "effective," "reliable," "optimal" and "safe" in its marketing, advertising and promotional materials.

33. Defendants promotional materials were false and intentionally misleading. At the time these representations were made, between 2008 and 2015, defendants already had ample evidence which would have provided any responsible corporate citizen with at least a concern that the product was providing unreliable results. Despite this knowledge, Defendants concealed the truth from the public, and indeed made contrary representations which it knew were false.

34. Defendants made further misrepresentations to consumers and healthcare professionals by omitting material information from the packaging and marketing materials on the INRatio testing kit, in particular by failing to disclose that the INRatio Products produced false and erroneous results.

35. In September of 2011, a study was published in the New England Journal of Medicine, later known as the "ROCKET AF trial".

36. The purpose of the ROCKET AF trial was to compare the most commonly prescribed blood-thinner, warfarin, to a newer drug called rivaroxaban (hereinafter by its trade name, "Xarelto") to determine which drug was more statistically effective in preventing strokes and embolisms.

37. As part of the ROCKET AF study a large group of users of Warfarin used the INRatio Products to monitor their INRs and adjust their dosages accordingly. ROCKET.

A comparison of blood samples from over 5,000 of the ROCKET AF participants revealed that the INR data collected using the INRatio Products differed from the test results obtained from a third-party laboratory.

38. Johnson & Johnson, who was involved with the study, turned over the data from the ROCKET AF study to Alere.. Alere dismissed this study as having flawed methodology."

39. By January, 2013, The Defendants knew that the monitor was unreliable by virtue of: The letters it had received from the FDA, *the London Study* of which it was aware, ROCKET AF study of which it was aware, and the and the thousands of adverse event reports which documented complaints from consumers and healthcare professions that the product was delivering discrepant results.

40. The defendants intentionally disregarded the overwhelming evidence of malfunction, and continued to intentionally deceive physicians, healthcare providers, the government and the public.

41. Driven by corporate greed, a desire to protect their multi-billion dollar profits and with utter disregard for the human safety, the defendants continued to manufacture, sell and promote their products, and continued to make false representations regarding the safety of their product.

42. Driven by corporate greed, a desire to protect their multi-billion dollar profits and with utter disregard for the human safety, the defendants intentionally hid the existence of "adverse events" from the public and the FDA until they were caught in 2005 and 2006.

43. Driven by corporate greed, a desire to protect their multi-billion dollar profits and with utter disregard for the human safety, the defendants intentionally withheld from their customers of the thousands of instances of erroneous readings, the thousands of adverse reports, and the two ominous letters from the FDA.

**THE RECALLS**

44. On April 16, 2014, Defendants issued a voluntary recall notice to healthcare professionals for the INRatio2 test strips, citing the disparity between INR results obtained with the INRatio2 system versus significantly higher INR results when re-testing was performed by an independent laboratory.

45. Defendants' recall notice requested that customers immediately cease using the INRatio2 PT/INR *test strips* and instead use alternate methods to perform INR testing, including substituting INRatio PT/INR test strips for the defective INRatio2 PT/INR test strips.

46. The recall was a disingenuous and ineffective because defendants intentionally failed to implement an effective plan to notify end users and healthcare professionals. Neither Mr. Corbo or his doctor received notification in April that the product was recalled.

47. The recall was deceptive , by singling out the INRatio2 PT/INR *test strips* in the April 16, 2014 recall notice, Defendants intentionally concealed the underlying problem - that the monitoring kit in its entirety was defective.  As a direct result of its ongoing deception thereafter, from May 5, 2014 through July 30, 2014, plaintiff was induced to continue using the product.  This inducement was the direct result of defendant's effort to

hide from the public the fact of the recall itself, but also hide from the public and the government and that the underlying device (not just the test strips) did not work.

48. The April 16, 2014 recall notice failed to disclose what Defendants had known for years, that the product itself was routinely providing thousands of "discrepant" results, regardless of the type of strip being used. By directing users to substitute the INRatio PT/INR test strips for the defective INRatio2 PT/INR test strips, Defendants falsely and misleadingly represented to healthcare professionals and consumers that the INRatio PT/INR test strips worked properly, when in fact they caused false and erroneous results. Between April 16, 2014 and July 30, 2014,

49. The FDA classified Defendants' April 16, 2014 recall notice as a "Class 1" recall, because it involved the use of products which would cause serious adverse health consequences or death.

50. On December 5, 2014, under pressure from the FDA, Defendants issued a "voluntary" recall letter to customers for the INRatio PT/INR Monitor and INRatio2 PT/INR Monitor, as well as the INRatio PT/INR Test Strips. The letter stated, "[i]n certain cases an INRatio® PT/INR Testing kit may provide an INR result that is significantly lower than a result obtained using a laboratory INR system." In furthering its now established modus operandi of deflecting blame and protecting the commercial viability of its product,, the December 5, 2014 recall notice failed to state that the INRatio Products themselves were defective. Instead, the notice falsely stated that the false and erroneous results "can arise if [users] have certain medical conditions."

51. The notice also blames the false and erroneous results on the users' failure to "carefully follow the instructions for performing the test."

52. By falsely and misleadingly blaming the erroneous results on "certain medical conditions" and the failure to "carefully follow the instructions" in the December 5, 2014 recall notice, Defendants were attempting to continue to conceal their culpability in order to escape its obligation to the public it had harmed.

53. The FDA classified Defendants' December 5, 2014 recall notice as a "Class 1" recall, because it involved the use of products which would cause serious adverse health consequences or death.

54. On July 11, 2016, only *after* the filing of this and other lawsuits and class actions, Defendants issued a recall notice, withdrawing ALL INRatio Products from the market. The recall notice stated that Defendants had spent at least two years developing software enhancements to address the INRatio Products' defective qualities, but the FDA notified Defendants it believed the Defendants' studies did not adequately demonstrate the effectiveness of the software modification.

55. The recall notice also stated the FDA "advised" Defendants to remove the INRatio Products from the market.

56. By 2006, defendants were fully aware that its product was delivering discrepant results. However, by intentionally hiding, concealing and deceiving both the FDA, healthcare professionals and the publi,, Alere bought itself ten additional years of sales, and tens of millions of dollars in sales.

57.     The chronology as described above reveals an intentionally deceptive, immoral, unethical and unscrupulous pattern and modus operandi.  Defendants, in an effort to preserve the commercial viability of their product: (a) Intentionally hid adverse event reports from the FDA which revealed a long history of "discrepant" results; (b) Intentionally deflected blame from its product in an effort to deceive the public and the FDA; (c) Intentionally mislead the public with respect to the nature o the defect; (d) failed to take action to protect the public even after it knew of the clear dangers and risks associated with the discrepant results; and (e) intentionally failed to notify healthcare professionals and the public of recalls.  The actions of the defendants were in a deceptive and immoral, and placed their desire for profit and commercial viability above the safety of the Mr. Corbo and the public.  The the actions, inactions, misrepresentations, concealment, deception and utter disregard for human safety amount to a violation of the *Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. Sec. 42-110b et seq.*

58.     The the actions, inactions, misrepresentations, deception, concealment, and utter disregard for human safety as detailed above were carried out in the course of Defendants' trade and/or commerce.  Specifically, the behaviors were in connection with the manufacture, distribution, promotion and sale of their product.

59.     The the actions, inactions, misrepresentations, deception, concealment, and utter disregard for human safety as detailed above offends public policy.

60.     The the actions, inactions, misrepresentations, deception, concealment, and utter disregard for human safety as detailed above are immoral, unethical, oppressive and/or

unscrupulous, and caused substantial injury to consumers in general, and Mr. Corbo in particular.

61. The the actions, inactions, misrepresentations, concealment, and utter disregard for human safety as detailed above specifically caused Mr. Corbo an ascertainable loss., in that he was induced to pay for a product that did not work as promised.

62. The the actions, inactions, misrepresentations, concealment, and utter disregard for human safety as detailed above specifically caused Mr. Corbo an ascertainable loss., in that he was induced to pay for test strips that did not work.

63. The the actions, inactions, misrepresentations, concealment, and utter disregard for human safety as detailed above specifically caused Mr. Corbo an ascertainable loss., in that he was induced to *overpay* for a device that did not work as promised.

64. The the actions, inactions, misrepresentations, concealment, and utter disregard for human safety as detailed above specifically caused Mr. Corbo an ascertainable loss., in that he was induced to overpay for test strips that did not work as promised.

65. The deception as detailed above allowed the defendants to maintain a price on their devices and test strips that were higher had they not engaged in deception.

66. The deception as detailed above allowed the defendants to keep the product on the market longer than it would have in the absence of deception.

67. The the actions, inactions, misrepresentations, concealment, and utter disregard for human safety as detailed above specifically caused Mr. Corbo an ascertainable loss., in that he was induced to pay for a product that did not work as promised.

68. Through July 30, 2014, plaintiff continued to use and purchase test strips and accessories which he would not have purchased had defendants not engaged in their intentional deception.

69. Between August 6, 2014 and January 12, 2015, during which point defendants' deception was continuing, plaintiff was caused to expend thousands of dollars to hire a consulting expert to discover the very information, facts and truths that defendants had intentionally hid — that their product did not work, a fact which they ultimately conceded by withdrawing their product from the market in summer of 2016.

70. As a result of the deception, plaintiff was induced to prick himself and remove blood from his body, all for a purpose which defendants new to be useless.

71. A copy of this complaint has been mailed to the Attorney General of the State of Connecticut and Commissioner of Consumer Protection.

PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for the following relief:

1.  Money damages.

32.  Compensatory damages, attorneys fees, costs and punitive damages pursuant to Conn. Gen. Stat. Sec. 42-110(g).

4.     Such other relief as to law or equity pertain.

PLAINTIFF

By_____
JOSE M. ROJAS, ESQ.
His Attorney
The Rojas Law Firm, LLC
40 Russ Street
Hartford, CT  06106
(860) 232-3476
Juris No.  423940

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

MICHAEL CORBO                           :            **CIVIL ACTION NO.:** _____
                                        :
                                        :
   VS.                                  :
                                        :
ALERE, INC.                             :         :
ALERE HOME MONITORING, INC.             :
ALERE SAN DIEGO, INC                    :         May 5, 2017

<u>JURY DEMAND</u>

    Plaintiff hereby demands a jury.

                                                    PLAINTIFF

                                       By_____
                                           JOSE M. ROJAS, ESQ.
                                           His Attorney
                                           The Rojas Law Firm, LLC
                                           40 Russ Street
                                           Hartford, CT  06106
                                           (860) 232-3476
                                           Juris No.  423940